MARGARET STEGER, CARRIE DENTON, DORA WAIDLICH, MAE HARMON, JAMES WHYBARK, MAUDE VAUGHT, OPAL WHYBARK, GLADYS GOLIGHTLY, CLINT WHYBARK, and GUY WHYBARK, RAYMOND WHYBARK and ARTHUR WHYBARK, JR., by MARGARET STEGER, Next Friend, Appellants, v. ANTHONY SEABAUGH, MAGGIE SEABAUGH, BERNIE SEABAUGH, ZELLA SEABAUGH, MARTHA MAYFIELD, HENRY MAYFIELD, DELLA DALTON, LEVI DALTON, MYRTLE KNOWLES, LIZZIE DOGGETT, RELLA BROTHERTON, PINK BROTHERTON, GEORGE SEABAUGH, IDA SAMPLE and C. W. SAMPLE.—142 S. W. (2d) 1001.

Division Two, September 10, 1940.

*Finch & Finch* for appellants.

*Homer F. Williams* and *C. P. Damron* for respondents.

ELLISON, P. J.—The suit is in equity to reform on the ground of mutual mistake a deed executed by C. C. Seabaugh to his wife, Hannah, both deceased. There were no children by their marriage, but both had been married before and the contest is between their respective heirs through these former marriages. The judgment below was for defendants.

Mr. Seabaugh owned a 120 acre farm in Bollinger County, shaped like an inverted and reversed letter L. The west 40 acres, on which the house and barn were located, was described as the NE ¼ of the NE ¼ of Sec. 31, Tp. 33, Rg. 10. This tract lay immediately west of the north forty of the remaining 80 acres, described as the W ½ of the NW ¼ of Sec. 32, same township and range. In other words, the section line ran between the west forty and the contiguous part of the eighty, and there is no evidence that the improvements were so close to the line as to cause any confusion about their location. The deed in suit executed by Mr. Seabaugh conveyed the west forty acres of the 80 acres—W ½ of W ½ of NW ¼ Sec. 32—a strip of land one-half mile long north and south, and one-eighth mile wide east and west. Appellants assert it was the mutual intention of the parties to have the deed convey the west forty acres of the whole farm—NE ¼ of the NE ¼ of Sec. 31—whereon the improvements were located. Respondents rejoin the grantor meant to convey the land described in the deed, and was mistaken only in believing the improvements were on that tract.

The reason prompting the conveyance was that Mrs. Seabaugh had sold a separate residence property of her own and used at least a part of the proceeds in rebuilding the barn and for fencing the land, on which it stood. In repayment Mr. Seabaugh desired to convey that 40 acres to her. The 80 acres was encumbered by a mortgage (which was foreclosed before the suit was filed). With this actuating background he called in an acquaintance, Jack Willfong, and also summoned Mrs. Florence Seabaugh as scrivener. [She was not interested or of kin to the grantor, so far as the record shows.] Mrs. Hannah Seabaugh, the grantee, took part in the conversation. The

old couple informed the scrivener the question of making the deed for the reasons stated above had been under discussion between them. In giving her testimony the scrivener was explicit and stated several times the grantor said he wanted to convey the 40 acres upon which the house and barn were located; that being also the part of the farm which was free of encumbrance. Mr. Willfong did not enter the room until after the deed was written. The grantor informed him he was "making Hannah Seabaugh a deed for this forty acres of land the house sets on. . . .". The grantor told the scrivener he could not write, and signed the deed by mark. One of the plaintiffs testified he had stated to her several times he couldn't read. But one of the defendants declared Mrs. Seabaugh, the grantee, informed him the grantor could read and knew what was in the deed.

After the conversation already detailed the grantor got the family Bible and produced two old deeds therefrom. The scrivener testified he "opened them up and said 'now there is a trust deed on part of this, I want to deed the forty acres the house and barn is on' and he showed me the description that was as he thought the description of the forty-acre home place. He said 'this is what the trust deed is on and this is the forty-acres the house and barn is on.' He told me to make the deed for the one that was clear and he showed me what he thought was clear, that is, what he thought was the forty acre home place."

Then the scrivener proceeded to narrate that she drew the deed "according to his instructions . . . covering the description he pointed out as covering the home place." She didn't see the deed for the home forty acres and it was her recollection that the deed from which she drew the conveyance in suit, covered 80 acres. Continuing she testified, "he just showed me what he wanted me to make it on, he said the rest was covered by a trust deed. . . . I made the description just as he showed me, he just pointed it out." Later she stated, "Mr. Seabaugh didn't read off the description but simply pointed out a description as the description of the home place. I wrote it just as he directed me. I wrote the deed exactly the way he told me to write it and it covered the land he told me to include in that deed. . . . I found out it was a mistake when they told me the deed didn't cover the home place."

On cross and re-direct examination the scrivener was asked whether she noticed the deed from which she was getting the land description was for two forties lying north and south, with "this other forty over by itself," and she answered "Yes Sir. This forty is what he intended to deed." From recollection she couldn't say whether she made the deed for the west half of the eighty-acre tract, but when the deed in suit was exhibited to her, she admitted that was what the description called for. She further explained she had no plat of the land, and that she didn't know about the description as the land

was not in her territory. Nevertheless she insisted she wrote the deed according to the grantor's instructions. Later she said the grantor showed her only one deed, and from what she "gleaned" it must have described the whole 120-acre farm.

If human testimony means anything these facts are clearly established. First it was the intention of all the parties—the grantor, the grantee and the scrivener—to make the deed in suit convey the square home forty acres in Sec. 31, on which the house and barn were located and which alone was free of incumbrance. Second, what the deed as drawn did convey was not this west forty acres of the whole farm, but the west forty acres of the eighty acre part of the farm in Sec. 32, being a narrow strip one-half mile long north and south and one-eighth mile wide, which was included in the mortgage and did not have the improvements on it. This strip split the farm in the middle, leaving the home forty acres on its west side and the east half of the 80 acres on its east side. Third, neither of the two deeds produced by the grantor from the family Bible described the whole farm, but one covered the home forty acres in Sec. 31 and the other the eighty acres in Sec. 32. That is conceded in the record. Fourth, the scrivener drew the deed in suit for the west forty acres of the land description pointed to by the grantor in the deed he handed to her, which means he gave her the deed for the eighty acres instead of the deed for the home 40 acres.

Respondents do not seriously dispute these propositions, but say in their brief that appellants "entirely overlook that part of the testimony which clearly explains the whole difficulty in this case, and that is that the grantor was not mistaken as to the forty acres he wished to convey, but was mistaken as to the forty on which his house and barn stood, a fact not taken into consideration by him in making the conveyance in question." We are unable to find any evidence of this in the record, and it is forcing matters to argue that the grantor did not know on which 40 acres of his 120 acre farm his own home was located, especially when it is remembered that he acquired the 80 acres by a different deed.

In addition to that, the grantor stated the home forty acres was clear of encumbrance whereas the eighty acres was not; and that he wanted to convey the unincumbered land. To get around that it would have to be argued further that the grantor did not know the mortgage covered the forty acres described in the deed in suit. Such a theory is untenable. The only possible explanation that will accord with the evidence is that the grantor handed the scrivener the wrong deed to copy from, by mistake. Respondents admit there was a mistake, but do not dispute the testimony of the scrivener and Jake Willfong. They merely parry it on the theory stated in the preceding paragraph; and also stress alleged admissions made by the deceased grantee, Hannah Seabaugh, to two respondents severally that her

husband, the grantor C. C. Seabaugh, made the deed in suit as he wanted to and knew what was in it, and that she claimed no interest in the home place except her dowry.

Respondents cite General Refractories Co. v. Sebek, 328 Mo. 1143, 1153, 44 S. W. (2d) 60, 64, a suit to reform for mutual mistake a certain clay mining lease. In the lease was a reservation: ''no mining and drilling within 200 *yd.* of any building.'' (Italics ours.) The proposed reformation would have substituted the word ''feet'' for ''yd.'' in this reservation. There was a clay pit on the land within 200 yards of the lessor's dwelling house but not within 200 feet, and plaintiff contended the intention was to include that pit in the lease. This court affirmed a decree against plaintiffs holding the parties may have ''intended that the particular clay pit . . . should be included in the lease. But, even so, it does not follow that the lease as written does not correctly set forth the contract actually entered into by the parties. They may have assumed that the pit was not within 200 yards of any building, for at the time of making the lease neither knew its distance from the buildings, and no measurements were made.''

That case is not in point because here the grantor did know and definitely fixed the identity of the 40 acre he desired to convey by saying it was the home forty on which his house and barn were located, and the only unincumbered part of his farm. That description could not have referred to any forty acres other than the one in Sec. 31. The situation in the above Refractories case would have been similar if the parties there had identified the land to be leased as the part on which the clay pit was located, instead of specifying a certain tract and assuming the clay pit was on that tract.

Appellants rely on Bartlett v. White (Mo. Div. 1), 272 S. W. 944, where Div. 1 of this court reversed the trial court and reformed a deed of a 160-acre farm in Pike County, executed by a father to a son for services, care and attention. Respondents distinguish that case saying the 160-acre farm there was the only land owned by the grantor in Pike County. But so here, the 40 acres in Sec. 31 was the only land owned by the grantor which would fit the description he gave to the scrivener—the forty acres on which his home was located, and which was free from incumbrance. Furthermore, there is no possible explanation for his conveying to his wife 'a long, narrow strip through the middle of his farm, subject to the encumbrance on the rest of the eighty-acre tract, as the deed in suit did do. If the scrivener had incorporated in the deed the further specific description given her by the grantor that the forty acres conveyed was that on which his house and barn were located, and was the only unincumbered part of his 120-acre farm, there would be no question about the right to reform. [Whitaker v. Whitaker, 175 Mo. 1, 10, 74 S. W. 1029, 1031; Fancher v. Prock, 337 Mo. 1119, 1124, 88 S. W. (2d) 179, 182.] And

as we have already said the controlling evidence in this case is not seriously disputed, and is almost as conclusive as if it had been written in the deed.

 It is true that where the disputed evidence in an equity case is oral we will ordinarily defer to the finding of the trial chancellor, Kidd v. Brewer, 317 Mo. 1047, 1060, 297 S. W. 960, 966. But there are numerous instances where we have felt unable to follow the chancellor's findings. In fact the decree was reversed in that very case. [See also 3 West's Mo. Dig., sec. 1009(1).] It is only because the evidence seems so clear that we feel constrained to disagree with the able chancellor who tried the case below.

 We understand the opening paragraph of the dissenting opinion means the appellants have briefed the case here on the theory that the erroneous description in the deed was due to a mistake of the scrivener, not to a *mutual* mistake of the parties. It says: "this case was tried and briefed in this court on the theory that the scrivener had made a mistake in preparing the deed;" and then quotes the fourth point under Points and Authorities in appellants' brief, as follows: "Where there is clear, cogent and convincing proof that a deed supported by a valuable or meritorious consideration does not express the agreement of the parties on account of a mistake in preparation of same by a scrivener acting for both parties, equity will reform the deed so as to correctly express the agreement and understanding of the parties."

 In our view the point as quoted does mean the mistake was mutual. Where the parties to a deed have agreed upon the land to be conveyed thereby and entrust the preparation thereof to a scrivener, even if he alone makes a mistake in drawing the deed, still if the grantor executes and the grantee accepts it believing it expresses their true intention, the mistake is mutual. But even if we concede the point as worded is ambiguous, the next point (Point V in appellants' Points and Authorities) clears it up and shows appellants' theory was that the mistake was mutual. (Italics in all quotations hereafter are ours.) It says: "The evidence in the case at bar was clear, cogent and convincing proof of a *mutual* mistake of fact in the preparation of the deed so as to entitle plaintiffs to a decree reforming the description in the deed."

Not only that, but in the very first paragraph of the Argument in appellants' brief, in enumerating the three requirements necessary to the reformation of a deed "on account of *mutual* mistake of fact," the third requirement named is that "there must be clear, cogent and convincing proof that through *mutual* mistake of the parties the deed did not speak the true agreement of the parties." Appellants' answer in the trial court pleaded that "the failure of the deed to properly describe the forty-acre home place was a *mutual* mistake made by the scrivener and C. C. Seabaugh and Hannah Seabaugh at the time

of the preparation of the deed. . . ." The evidence was directed to the issue whether the parties to the deed intended it to convey the land described therein or another forty acres, i. e., the home place. And respondents argue in their brief there was a mutual mistake, conceding both parties intended the deed to cover the home place, but thought the improvements were on the land described in the deed.

For these reasons we think the contention in the dissenting opinion is erroneous and that the decree should be reversed and the cause remanded with directions to enter a decree reforming the deed as prayed, by making the same describe the real estate conveyed as the northeast quarter of the northeast quarter of section thirty-one, township thirty-three, north, range ten, east, Bollinger County, Missouri.

*Leedy, J.,* concurs.

TIPTON, J. (dissenting).—I am unable to agree with the majority opinion in this case. As I see it, this case was tried and briefed in this court on the theory that the scrivener had made a mistake in preparing the deed. The appellants' main point in their brief is as follows:

"Where there is clear, cogent and convincing proof that a deed supported by a valuable or meritorious consideration does not express the agreement of the parties on account of a mistake in preparation of same by a scrivener acting for both parties, equity will reform the deed so as to correctly express the agreement and understanding of the parties."

There were only two witnesses to the contract and the execution of the deed; they were Jake Willfong and F. G. Seabaugh, the scrivener who prepared the deed.

Willfong testified in substance as follows: That he remodeled the barn and the grantee paid for some of the material; that she paid for some of the groceries he bought for her husband and her; that he was present when F. G. Seabaugh was there to prepare the deed but said, "I don't think I was in the room at the time they discussed how the deed was to be made. I was in the room after the deed was written. . . . I went in and when I took the pencil in hand I said, 'What are you doing here?' . . . He said, 'I am making Hannah Seabaugh a deed for this forty acres of land the house sets on, just like I told you I was going to do.' I then put my name on a piece of paper they had that they said was the deed. That is my signature on the deed."

The essential part of the testimony of F. G. Seabaugh is as follows: "Jake Willfong and Mr. Seabaugh and his wife were present when I arrived. We talked a while and I asked them the nature of them calling me and we talked and it was said that they had been talking between themselves, Mr. and Mrs. Seabaugh, in regard to deeding the home forty-acres . . . I said . . . I am here to do

736

the work for you. Mr. Seabaugh got up and went over in the other room and he got the family Bible in which the deeds were and he brought them out and laid them on—I don't remember whether it was the sewing machine or table—and he got the deeds out and opened them up and said 'now there is a trust deed on part of this, I want to deed the forty-acres the house and barn is on' and he showed me the description, that was as he thought the description of the forty-acre home place. He said 'this is what the trust deed is on and this is the forty-acres the house and barn is on.' He told me to make the deed for the one that was clear and he showed me what he thought was clear, . . . I got busy and made the deed according to his instructions, the deed being from Mr. Seabaugh to Mrs. Seabaugh, covering the descriptions he pointed out as covering the home place. After I prepared the deed I asked him if he could sign his name to it and he said he couldn't. I wrote his name on it and had him make his mark and I signed it as one witness and I think Mr. Willfong signed it as the other witness. The deed was then acknowledged. . . . *The description in that deed is the description he pointed out as being the description of the home place. It was my understanding at that time that the deed was to cover the home place, and that was my understanding of the directions.*"

On cross-examination F. G. Seabaugh's testimony was as follows: Q. "When you took the deed and filled out the descriptions you saw this deed, did you not, that he gave you was for eighty-acres—two (2) forty lying North and South and this other forty over by itself?" A. "Yes, sir. This forty is what he intended to deed . . . I wrote it as he wanted it."

And on redirect examination his testimony was: "Both Mr. and Mrs. Seabaugh and Mr. Willfong were present during the conversation and when the deed was prepared. I was directed to prepare a deed covering the home place. It was my understanding at the time that the deed I prepared did cover the home place, those were the directions Mr. and Mrs. Seabaugh had given me. Mr. Seabaugh didn't read off the description but simply pointed out a description as the description of the home place. I wrote it just as he had directed me."

The evidence further shows that the three forty-acre tracts of land had been conveyed to the grantor by two deeds, the eighty-acre tract in Section 32 by one deed and the forty-acre tract in Section 31, or the home place, by another deed. The scrivener was not shown the deed to the home place.

From the evidence, I conclude that the scrivener did not make a mistake in describing the land in the deed; he testified that "I wrote it as he wanted it. I make the description just as he showed me, he just pointed it out." The mistake, if any, was not in the description

but was the grantor's mistake in thinking the house was on the forty acres that he wanted to convey to his wife.

To reform a deed under this evidence we would have to make a new contract for the grantor. This we cannot do. He may have been perfectly willing to deed the land described in the deed with the house and barn on it but not willing to deed the land that it was actually on.

I disagree with the majority opinion when it states that the case of General Refractories Co. v. Sebek, 328 Mo. 1143, 44 S. W. (2d) 60, is not in point. I think it is very much in point as the following quotation from that case will show:

"*It may be true that both Toelke and Sebek intended that the particular clay pit just referred to should be included in the lease. But, even so, it does not follow that the lease as written does not correctly set forth the contract actually entered into by the parties.* They may have assumed that the pit was not within 200 yards of any building, for at the time of making the lease neither knew its distance in feet from the buildings, and no measurements were made. And if the lease was written just as the parties intended it should be written, that is, correctly embodies the terms of the contract actually entered into, there is no ground for its reformation. 'A contract cannot be reformed for a mistake not in the contract itself or in the writing embodying it, but of an extrinsic fact which, if known, would probably have induced the parties to make a different contract.' [23 R. C. L. 321; Webster v. Stark, 10 Lea (Tenn.) 406.] In other words, the court cannot supply an agreement that was never made. [Tesson v. Insurance Co., 40 Mo. 33, 93 Am. Dec. 293.]" (Italics mine.)

Nor do I agree that the case of Bartlett v. White, 272 S. W. 944, supports the appellants' contention. In that case the scrivener was given a deed which the grantor had received when he bought the land, which correctly described the land, and in copying the description of the land the scrivener made a mistake as to eighty acres, while in the case at bar the description was correctly copied from the deed the grantor received and the scrivener did not even see the deed to the land on which the house was situated.

I think the judgment should be affirmed.